Shauck, C. J.
We understand it to be conceded that prior to November 15, 1912, when the constitutional amendment set out in the statement of the case became effective, the councils of municipalities were without authority to use public moneys for the purpose of establishing and operating moving-picture shows. Certainly the absence of plain statutory authority therefor denotes its absence. As the city of Toledo had existed and flourished from its founding without a municipally-owned attraction of that character, the declaration of the second section of the ordinance that it is an “emergency measure” must be taken to mean that it is a measure for which there is now supposed' to be opportunity.
The case of the relator requires it to maintain the two propositions that without action by the general assembly or the electors of the city' its council may “exercise all powers of local self-government,” and that the suggested mode of entertainment is within those powers. Both propositions are denied. Brief attention to the history out of which this amendment arose will aid materially in understanding its form and some of its provisions and in answering some of the questions which the present case presents for determination.
The first half-century of our statehood, as was universally conceded, had demonstrated the necessity for uniform legislation upon the subject of corporations, both municipal and private, in order that there might be a system of corporate law. This was a recognition of the very great importance of opportunity to know what the law is. Such uniformity was in terms required by the constitu *91 tion of 1851. Thereafter municipalities rapidly increasing in size and numbers attracted the attention of lobbyists whose schemes were not always acceptable to each other nor to a majority of legislators, and resort was had to a scheme of acts of limited operation, though in a form assumed to be general, whereby the-practical operation of the requirement was weakened and finally so far annulled that the municipal law of the state was without form and much of it was void. By the year-1902, the situation was recognized as intolerable and the full operation of the constitutional requirement was restored. Throughout the ensuing decade, that requirement was respected by all departments of the government of the state; municipal credit was greatly improved, and it became apparent that every city in the state had a much better government than any had before. But progress toward the perfection of the uniform municipal code was slow. It-was retarded partly,' at least, by differences in the suggestions of natural persons who control or desire to control the exercise .of municipal power. These were said to be differences in the needs of different municipalities. Many believed that thfe differences were altogether subjective and in no sense objective. There was, too, a belief entertained by many disinterested persons that the form of government devised was, at least in many of the municipalities, too expensive and that it added unnecessarily to the burden of taxation. It resulted that in framing the amendment now under consideration, influence was exercised both by those who believed that the best results could be obtained by continuing to *92 unite the intelligence and activity of the state upon a further improvement of the General Code and by those who believed that more satisfactory results could be reached by conferring upon the electors of different municipalities a larger influence in establishing the instrumentalities for their local government. Full authority for this statement is found in the provisions of the article.
By the first and second sections municipalities are classified as cities and villages, and the legislature is peremptorily required to pass general laws for their organization and government. On the 15th of November, when the article took effect, such laws were already in force, and they continued to be in force, operating upon every municipality in the state until a change should be effected in some mode authorized by the amendment. This conclusion results necessarily from the fa.miliar doctrine of Cass v. Dillon, 2 Ohio St., 607, where it was held that the new constitution of the state (that of 1851) created no new state. It only altered in some respects the fundamental law of a state already in existence; and even this was done pursuant to the prior constitution, under whose provisions the convention was called and the new constitution framed. It follows that all laws in force when the latter took effect, and which were not inconsistent with it, would have remained in force without an express provision to that effect: and all inconsistent laws fell simply because they were inconsistent; in other .words, all repugnant laws were repealed by implication. The conclusion also results from the express provision of the general schedule to the present amendments: “All *93 laws then in force [when the adopted amendments took effect] not inconsistent therewith shall continue in force until amended or repealed.” It follows that on the 15 th of November the government of every municipality in the state remained unchanged.
But the amended article authorizes the electors of a municipality to secure some immunity from the uniform government which it perpetuates as the primary status of all municipalities, and to entitle their municipality “to exercise all powers of local self-government.” We have heard and read much discussion of the cases upon the self-executing capacity of constitutional provisions. The rational rule upon the subject clearly deducible from the decided cases is that such provisions are, or are not, self-executing according to their nature and terms. Much of the discussion in the cases cited relates to constitutions which perform the function heretofore regarded as appropriate of locating the powers of government and defining the modes of their exercise. From that source but little argument can be drawn to affect the interpretation of an instrument so largely legislative as is this. It is also to be observed that questions respecting the self-executing capacity of constitutional provisions usually relate to the necessity for legislative action to make them effective. This article provides two modes of securing the permitted immunity from the operation of the uniform laws which the legislature is required to pass. One of them is defined in the second section, and manifestly it is .not self-executing, for it expressly authorizes the legislature to pass “additional laws,” *94 that is,- taws additional to the general laws which the legislature is required to pass, such additional laws to become operative in a municipality only after their submission to the electors thereof and affirmance by a majority of those voting thereon. The other mode is defined in the provisions of the later sections relating to the adoption of charters. From the terms and nature of these latter provisions they are self-executing in the sense that no legislative act is necessary to make them effective.
A fundamental defect in the relator’s case is that it assumes that a power conferred upon a municipality is conferred upon its council, although every provision of the amendment with respect to this body merely áuthorizes. it to make provisions for ascertaining the will of the electors. No additional act of the legislature is contemplated with respect to the adoption of a charter. The clear provisions of that article are first for the submission by the council to the electors ■ of the question: “Shall a commission be chosen to frame a charter?” and, that question being answered in the affirmative by a majority of the electors, that any charter framed shall be submitted to the electors at. an election “provision for which shall be made by the legislative authority of the municipality in so far as not prescribed by general law;” the meaning of. which plainly is that the municipal council may legislate first with respect to the preparation of a charter and second with respect to a submission to a popular vote of a charter framed, and that an approving vote of a majority of the electors of the municipality is indispensable to the adoption of a charter or the securing of any *95 power beyond the general law. It seems, therefore, to be entirely beyond doubt that'since the city of Toledo had not by a vote of its electors approved any additional law passed by the general assembly, • and that its electors had not adopted a charter, the municipality and all of its departments have only such powers as were conferred by the general law; that is, such power only as it had prior to the 15th of November. In some of the cities of the state the subject of adopting charters is, as we learn from counsel and from the public press, receiving consideration. It should occasion no •surprise that we are urged to attempt here a complete exposition of the powers of local self-government which in that mode municipalities may exercise. But as the case we are to determine does not call for such comprehensive exposition, judicial propriety forbids it. Obviously, the adoption of a charter will be regarded as offering opportunities for the use of public money which the uniform law does not permit, and which perhaps it will never permit, but we cannot anticipate all the enterprises which may be suggested, and we should not assume in advance to be able to anticipate all the learning which may be bestowed upon an analysis of the instrument. It is, however, pertinent to observe that at a time when there is serious need to use the public credit for the repair of extensive injuries to public property wrought by disastrous floods, something has occurred to impair that credit to a very serious extent. Obviously, there are far-reaching laws which cannot be annulled by statutes or constitutional amendments.
*96 But the case before us presents the question whether the establishment and operation of a moving-picture show is within “the powers of local self-government,” and the question has received' the attention of able counsel. In the amendment the phrase is used without definition and with the manifest intent that its operation shall be according' to its established meaning. It is fundamental in interpretation that statutes in derogation of the common law and amendments to statutes and constitutions shall have such and only such operation as is due to the natural import of their terms. The effective search for truth as well as the decorum due the convention and the people by whom the' amendment was framed and adopted requires us to impute to them a knowledge of that fundamental and familiar rule, and also to assume that they expected the courts to apply it to their work. Since municipalities get their powers from the. state, it is mathematically certain that they can include no power not possessed by the state. Local self-government is necessarily a part of government less than the whole.
In The State, ex rel., v. Guilbert, 56 Ohio St., 575, we recognized the truth familiar to all constitutional lawyers, that the functions of the state are governmental only, except so far as proprietary rights may become incident to the exercise of the primary function, and that since the insuring of titles does not essentially differ from any other insurance or business, the state cannot enter upon the business of insurance. How little would remain of the assurance which the Bill of Rights gives to minorities as well as to majorities that:' *97 “All men * * . * have certain inalienable rights, among which are those of * * * acquiring, possessing and protecting property,” and that private property may be taken only for uses which are public, if the proceeds of industry and thrift may be seized for the establishment and operation of moving-picture shows and all other imaginable purposes not more frivolous nor more remote from the functions of government.
Consciousness of inadequate prevision forbids an attempt at a conceptual definition of the phrase “all powers of local self-government” to be applied to all cases that might arise. But an obviously correct descriptive definition is sufficient for the case in hand. They are such powers of government as, in view of their nature and the field of their operation, are local and municipal in character. The force of the terms employed requires the inclusion of such powers to be exercised by officials who in some manner and to some extent represent the sovereignty of the people. It as clearly excludes the exercise of functions which are appropriately exercised by caterers and impresarios. The suggestion that moving-picture exhibitions might be made educational is gratuitous because^ that is not their natural object. It is unavailing because article VI. of the Constitution shows that education supported by taxation is to be conducted by “a system of common schools throughout the state.”
Among those who had attentively studied the functions of written constitutions it was accepted as a sound proposition that a municipality might own and operate only such utilities as it used in / its municipal operations. Those- who are respon-' *98 sible for this amendment were aware that no enlargement of that capacity was denoted by the provisions of the third section that “municipalities shall have authority to exercise all powers of local self-government,” and, therefore, they employed the express language of the later section of the article to confer that capacity with respect to other utilities. And as to them there are provisions to safeguard the interests of the people, while capacity to operate- amusements, if conferred at all, is conferred without restriction. If the language of this instrument were so doubtful as to require construction, a most natural question would occur, and the answer to it would be inevitable: Could we rationally impute an intention to authorize such use of the public money to those who were seeking to reduce the cost of municipal government and the consequent burdens of taxation?
The conclusion that this would be an unauthorized use of public money seems clearly to result from these considerations. If additional authority is desired to support a conclusion so obvious, it may be found in the reporter’s abstract of the briefs.

Writ refused.

Newman and Wilkin, JJ., concur.
Johnson, J., concurs in the first proposition of the syllabus and in the judgment.